UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-10036 MRW | Date | July 8, 2024 |
|---|---|---|---|
| Title | Lopez v. United States | | |

| Present: | Hon. Michael R. Wilner, U.S. Magistrate Judge | |
|---|---|---|
| | Eddie Ramirez | n/a |
| | Deputy Clerk | Court Reporter / Recorder |
| | Attorneys for Plaintiff: | Attorneys for Defendant: |
| | n/a | n/a |

**Proceedings:** FINDINGS OF FACT AND CONCLUSIONS OF LAW FRCP 52

    1.    The Court conducted a bench trial in this medical malpractice matter. After the conclusion of the evidentiary presentation, the Court received post-trial briefing in lieu of closing arguments. (Docket # 81, 82, 85 (corrected reply).) Additionally, the Court considered an additional state court judicial opinion that Plaintiffs submitted that post-dated the trial. (Docket # 84.)

    2.    The lawsuit involves the sad death of a former military serviceman. The trial testimony – particularly that of his parents, who attended the entirety of the presentation – was aching to hear. However, for the reasons stated below, the Court concludes that Plaintiffs did not persuade me by a preponderance of the evidence that the practitioners engaged in negligence, malpractice, or caused the veteran's death. As a result, the Court enters judgment in favor of the defense.

**Background and Key Facts**

    3.    The parties generally agree on the timeline of key events. Carlos Lopez, Jr. served in the U.S. Army for several years. He was deployed to the Middle East, where he engaged in combat. He incurred significant physical injuries (including a traumatic brain injury) during his time in the military. Along with that, he was diagnosed with considerable mental health disorders.

    4.    After his return to civilian life, Mr. Lopez received medical and mental health treatment from the Veterans Administration. Of relevance to this civil action, Mr. Lopez went to a VA neurology clinic in Los Angeles in May 2018. Mr. Lopez complained about ongoing back pain. (Ex. 8 (treatment notes).) A resident physician (Dr. Chong) and his

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-10036 MRW | Date | July 8, 2024 |
|---|---|---|---|
| Title | Lopez v. United States | | |

attending supervisor (Dr. Wilson) prescribed gabapentin for Mr. Lopez. He was directed to return to the clinic in five months for a follow-up visit. (Id. at 5.)

5. In June 2018, Mr. Lopez walked into a VA mental health clinic in downtown Los Angeles. He asked to see a psychiatrist to discuss disturbing nightmares that were affecting him. Mr. Lopez was initially evaluated by a psychiatric nurse (Torio) and then met with a psychologist (Dr. Holland). After meeting with Mr. Lopez for about a half hour, the psychologist concluded that Mr. Lopez was at "low risk for self[-]harm" or harm to others. (Ex. 10 at 3 (treatment notes).) Mr. Lopez was discharged, with his next mental health appointment scheduled for August.

6. Several days later, though, Mr. Lopez took his own life. According to the coroner's notes, Mr. Lopez told his parents and his roommate that he had recently changed his medications. The roommate described Mr. Lopez as jittery and "acting weird" shortly before he killed himself. (Ex. 28 at 2.)

7. Mr. Lopez's parents filed this civil action against the United States as his survivors and successors-in-interest. The complaint alleges state law causes of action for medical malpractice and wrongful death (made available against the federal government under the Federal Tort Claims Act). The gist of the complaint asserts that Dr. Chong "prescribed and provided" gabapentin to Mr. Lopez "without a careful medical/mental evaluation and assessment of [his] mental status," and without "reasonable care and observation and monitoring." (Docket # 1 at ¶¶ 27, 28.) The complaint also alleged that Dr. Holland "misdiagnosed [Mr. Lopez's] acuity level and failed to admit him to the hospital" when he came to her clinic. (Id. at ¶ 32.)

8. At trial, the Court heard testimony from (a) Drs. Holland, Chong, and Wilson (the treating practitioners); (b) Drs. Danon, Jacks, and Greils (practitioners designated as expert witnesses by the parties); and (c) Mr. Lopez's parents and his former roommate (Mr. Lee). The Court also received numerous records, including the VA treating / encounter notes from Mr. Lopez's appointments.

## Key Legal Principles

9. The parties do not dispute the elements of the common law causes of action underlying this action. In an action under the FTCA, the government's liability is determined by reference to state law. 28 U.S.C. § 1346.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No. | CV 21-10036 MRW | Date | July 8, 2024 |
|---|---|---|---|
| Title | Lopez v. United States | | |

10. Under California law, in turn, a plaintiff must establish (a) the duty of a medical practitioner to use the level of skill, prudence, and diligence as other members of the profession commonly possess and exercise; (b) a breach of that duty; (c) the practitioner's negligent conduct was a substantial factor in causing (i.e., a proximate cause of) the resulting injury; and (d) actual loss or damage resulting from the negligence. Powell v. Kleinman, 151 Cal. App. 4th 112, 122 (2007); CACI No. 400 et seq.

11. A plaintiff bears the burden of proof on these issues by a preponderance of the evidence. Johnson v. Superior Court, 143 Cal. App. 4th 297, 305 (2006); Baldonado v. United States, No. CV 06-7266 JHN (RZx), 2011 WL 3055308 at *3 (C.D. Cal. 2011). Expert testimony is required to prove or disprove whether a practitioner performed in accordance with the prevailing standard of care. Kelley v. Trunk, 66 Cal. App. 4th 519, 523 (1998).

12. Similarly, for a claim of wrongful death due to medical negligence, a plaintiff must establish "a reasonable medical probability that [ ] the death was more likely than not the result of negligence." Bromme v. Pavitt, 5 Cal. App. 4th 1487, 1498-99 (1992).

13. Questions regarding the standard of care and causation of injury are reserved to the finder of fact (be it jury or judge in a bench trial). Id.; Landeros v. Flood, 17 Cal. 3d 399, 410 (1976); Berley v. Anderson, 1 Cal. App.3d 790, 803 (1969).

## Analysis

14. As an initial matter, the Court observes that Plaintiffs' presentation at trial and in the post-trial briefing focused – to an inordinate degree – on whether and how Drs. Chong and Wilson warned Mr. Lopez about potential side effects from gabapentin. Indeed, the first two point headings in the closing brief summarizing Dr. Wilson's testimony are entitled "Lack of informed consent" and "Failure to read & discuss FDA insert & warnings." (Docket # 81 at 12-13)

15. That's problematic for several reasons. Nowhere in the complaint (Docket # 1), the pretrial conference order (Docket # 53), or Plaintiffs' proposed findings of fact (Docket # 56) did Plaintiffs specifically advance a claim of negligence based on this. Issues of consent to treatment or the adequacy of warnings to Mr. Lopez simply don't appear in the legal filings. That's a thin reed upon which to base a claim of professional misconduct like this.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-10036 MRW | Date | July 8, 2024 |
|---|---|---|---|
| Title | Lopez v. United States | | |

     16.    Moreover, the Court has no factual basis to conclude that, if the treating neurologists had made a more robust disclosure of potential side effects to Mr. Lopez, he would not have taken the medication, and would not have taken his life. There's simply insufficient evidence to persuade me that all of those links in the causation chain exist.[1] Plaintiffs failed to establish any proximate causation of damage based on the allegedly inadequate warnings about the medication. Powell, 151 Cal. App. 4th at 122; Johnson, 143 Cal. App. 4th at 305.

     17.    Even so, as a factual matter, I'm not convinced that the physicians did fail to properly advise Mr. Lopez. Of course, a physician has an obligation to inform a patient regarding risks of treatment. Both Drs. Chong and Wilson testified that they discussed potential side effects of gabapentin with Mr. Lopez. Their testimony was quite vague on details; the trial involved a single encounter more than five years earlier. And, as Plaintiffs rightly point out, the post-appointment notes do not record the substance of any specific warning or advice that the practitioners gave to Mr. Lopez. I accept Dr. Greils's conclusion that the lack of adequate recordkeeping / note-taking was improper.[2]

     18.    But, as a matter of fact, I believed both physicians when they testified about their general practice to discuss potential side effects with their patient. I also believed them when they stated that there was no reason why they didn't do that with Mr. Lopez. Both physicians were aware that gabapentin can affect a patient's mood and negative thoughts. Both were generally aware that this could impact their patients who were primarily military veterans. Dr. Wilson had previously treated Mr. Lopez, and was aware that he did not tolerate some medications well. Additionally, I particularly credit Dr. Wilson (a longtime (and now fairly senior) VA physician) when he explained that the

---

     [1]    The state supreme court's response to a certified question in Himes v. Somatics, LLC ___ Cal. 5th ___, 2024 WL 3059637 (June 20, 2024), does not significantly affect this analysis. Himes involved the obligations that drug manufacturers and treating physicians have toward advising patients about risks of a treatment, medication, or medical device. One of the key takeaways from Himes is the conclusion that a plaintiff "must prove that an objectively prudent person in the patient's position would have declined treatment" in the face of a "stronger warning" regarding the drug. Himes, 2024 WL 3059637 at *1. Plaintiffs presented no evidence and very little argument to support this contention.

     [2]    To the extent that a state law requires a physician to maintain accurate medical records (Cal. B&P C. § 2266), that supports the Court's conclusion that the notetaking of these VA practitioners was deficient. However, as above, there is no provable connection between the defective notes (confirming or refuting the physicians' advice) and Mr. Lopez's death.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-10036 MRW | Date | July 8, 2024 |
|---|---|---|---|
| Title | Lopez v. United States | | |

mood changes from gabapentin can potentially be <u>positive</u> for a patient; the medication can reduce pain, assist in increasing sleep, and thereby improve a patient's physical condition and mental health. While their recordkeeping was poor (the very purpose of medical notes is to record treatment and patient interaction to avoid after-the-fact disputes about what was said or done), Plaintiffs have not factually persuaded me that the warnings that these physicians conveyed to Mr. Lopez were negligent.[3]

\* \* \*

19.   Turning to the medication itself, I conclude that Dr. Greils's testimony regarding the dosage of the medication and the length of time until a follow up exam was insufficient to prove malpractice. Dr. Greils is a skilled and professional psychiatrist with an impressive medical background.[4] But I was not convinced that his evaluation of the conduct of practicing neurologists (even though Dr. Greils stated that he works with neurologists and he himself prescribes gabapentin) was appropriate in establishing the standard of care for those specialists.[5]

20.   I was somewhat more convinced by the testimony of Dr. Danon – a knowledgeable neurologist who prescribes gabapentin in circumstances akin to that presented by Mr. Lopez – that the dosage was within acceptable parameters. I also was persuaded by his testimony that a patient's pre-existing diagnoses of PTSD, traumatic brain injury, or depression would not preclude the administration of gabapentin. I accepted Dr. Danon's testimony that the occurrence of suicide as reported in medical literature, as described in the FDA materials, and as experienced in his practice following the prescription of gabapentin, was rare and uncommon.[6] I certainly accepted his

---

[3]   As the subjective finder of fact, the disclosures that Drs. Wilson and Chong conveyed in their trial testimony and in their clinical notes parallel what I hear when I go to the doctor. I've never had a physician pull out an FDA fact sheet to discuss all rare potential side effects.

[4]   The government's attempt to impeach him for his lack of Board certification fell flat. Dr. Greils's career essentially predates the advent of Board certification (particularly in the field of psychiatry). He's an expert, paperwork or not.

[5]   I was also unconvinced that Mr. Lopez's past mental health difficulties and far-removed previous suicidal thoughts would have required a reasonable practitioner to take different actions in prescribing gabapentin here. Dr. Greils did not persuade me as to what the physicians should have done differently here as a matter of professional practice.

[6]   To that end, Plaintiffs repeatedly emphasized their contention during the trial that the rate of suicidal ideation doubled (according to FDA data aggregation) as a result of gabapentin

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-10036 MRW | Date | July 8, 2024 |
|---|---|---|---|
| Title | Lopez v. United States | | |

testimony (and that of Dr. Wilson) that a typical practitioner would not contact family members of a competent adult to warn them about potential side effects.

      21.    The experts' opinions regarding the time period until Mr. Lopez's follow up appointment with the neurologists presents a closer call. According to their testimony, neither Dr. Greils nor Dr. Danon would have waited five months to see a patient after prescribing a new medication like gabapentin. That's a real problem for the government.

      22.    However, neither expert could point to an authoritative guideline or alternative practice rule about the propriety of such appointments. I take seriously Dr. Wilson's statement that he discussed mood changes with Mr. Lopez, told his patient to monitor any changes closely, and likely gave his personal cell number to Mr. Lopez. I also found persuasive Dr. Wilson's experiential observation that many vets <u>decline</u> medical treatment or medication from VA providers; the neurologist viewed Mr. Lopez as rational and reasonable for agreeing to the proposed treatment.

      23.    In any event, the length of time between the initial prescription and the putative follow up appointment became moot when Mr. Lopez presented himself at the mental health clinic several weeks after the commencement of the gabapentin. The five-month delay could not have been the proximate cause of any injury given that he complied with other aspects of the medical advice and sought help from a psychologist long before then.[7] <u>Landeros</u>, 17 Cal. 3d at 410; <u>Berley</u>, 1 Cal. App.3d at 803.

\* \* \*

      24.    The analysis regarding Dr. Holland is equally as straightforward. According to her notes – and the unchallenged same-day written observations of the psychiatric nurse, whom neither party called as a trial witness – Mr. Lopez did not appear to be in crisis when he showed up at the VA mental health clinic. Yes, he reported intense dreams regarding his combat experience, and said that he was not able to distinguish "between

---

use. As a matter of numeracy, though, the doubling of a microscopic number leads to another microscopic number.

      [7]    Put another way, Plaintiffs have not presented sufficient evidence to prove that a reasonable physician would have required that Mr. Lopez come back to her office within five-six weeks of the initial prescription (before he took his own life).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-10036 MRW | Date | July 8, 2024 |
|---|---|---|---|
| Title | Lopez v. United States | | |

real and not real." (Docket # 10 at 1-2.) And he obviously felt concerned enough to come to the clinic for assistance.

     25.     But both Nurse Torio (in her notes) and Dr. Holland (in notes and her trial testimony) described Mr. Lopez as alert, cooperative, responsive, clean, and not in apparent distress. Dr. Holland specifically described him as "euthymic," a term I understand to refer to someone with a normal mood. www.merriam-webster.com/medical/euthymia (accessed July 2, 2024). She also said that Mr. Lopez was not "responding to internal stimuli in session" – that means, no voices in his head or other delusional conduct. Dr. Holland testified that she spoke at length with Mr. Lopez, discussed self-harm with him, and concluded he was not acting in a way that required extreme action. After a half hour with Mr. Lopez, Dr. Holland elected not to involuntarily institutionalize him under state law. Nothing in the contemporaneous notes of the nurse who also met Mr. Lopez that day contradicted that conclusion.

     26.     It's clear that Mr. Lopez came to the VA that day because he was concerned about his mental health. I also accept that he discussed serious, violent, and disturbing dreams and thoughts that he had experienced.[8] But Dr. Holland explained that there was a distinction between those thoughts and the actual manner by which Mr. Lopez behaved and handled himself. I affirmatively do not accept Dr. Greils's conclusion that the VA practitioner should have instituted 5150 proceedings against Mr. Lopez based on his presentation to the clinic that day. And, while it would be optimal for a practitioner to spend several hours with a patient to "build rapport" as Dr. Greils suggested (and perhaps he actually does in his day-to-day private practice), I was not persuaded that this is the required standard of care for a psychologist at a walk-in clinic who has other contemporaneous patient responsibilities. Kelley, 66 Cal. App. 4th at 523.

     27.     I acknowledge that, if Dr. Holland was negligent in her treatment of Mr. Lopez (whether his condition was cause by gabapentin or any of his other mental health conditions), that could well be found to be the proximate cause of his suicide several days later. But I am unconvinced that the psychologist committed malpractice when she declined to engage in interventionary treatment after meeting with and evaluating her

---

[8] Dr. Holland's poorly-phrased "sanitization" of her notes to avoid recording graphic details of Mr. Lopez's dreams in no way impeached the believability of her notes or her testimony. All of Dr. Holland's observations paralleled those of Nurse Torio.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 21-10036 MRW | Date | July 8, 2024 |
|---|---|---|---|
| Title | Lopez v. United States | | |

patient that day.  Whether she was right or wrong in her assessment, Plaintiffs have not persuaded me that Dr. Holland's observations and care during the exam were negligent.

28. The Court therefore concludes as a matter of fact that Plaintiffs failed to prove that any of the VA practitioners committed malpractice.  I also conclude that Plaintiffs failed to carry their burden that any action of the neurologists was a substantial factor in his death several weeks later.[9]  Bromme, 5 Cal. App. 4th at 1498-99.  For this reason, I decline to take up the parties' arguments regarding compensatory damages.

**Conclusion**

29. I understand (and perhaps agree with) the Lopez family's belief that Carlos deteriorated not long after he started the gabapentin treatment in early 2018.  But the issue in this lawsuit is not how this young man came to take his life.  The issue is whether the VA personnel were negligent in their care of him.  Based on the evidence presented at trial, I cannot reach that conclusion.

30. The Court finds in favor of the government and against Plaintiffs.  Judgment will be entered separately.  The defense may seek to tax costs in a manner consistent with the Federal Rules of Civil Procedure and the Local Rules of Court.  Out of deference to the bereaved family, I'd encourage the government's lawyers to consider foregoing that relief.  Draper v. Rosario, 836 F.3d 1072, 1087 (9th Cir. 2016).

---

[9] I specifically reject Plaintiffs' contention that the government bears a burden here – whether at law or simply to defend the conduct of its professionals – to provide a reason for Mr. Lopez's suicide.  (Docket # 85-2 at 8.)